## UNITED STATES v. DELANEY.

District Court, D. New Jersey.
June 8, 1934.

Harlan Besson, U. S. Atty., and Walter B. Petry, Asst. U. S. Atty., both of Trenton, N. J., and Wm. H. Boyd, Sp. Asst. to Atty. Gen., for the United States.

Harry H. Weinberger and Hyman Halpern, both of Newark, N. J., for defendant.

Before CLARK and FAKE, District Judges.

CLARK, District Judge.

An application is made for bail. We have thought it wise in this district to lend perspective by prescribing the assistance of a judge other than the one who presided at the trial. The applicant has already been convicted of failing to pay his income tax to the United States. He objects to that conviction and wishes to point out the error or errors therein to the appropriate court of appeals. Under our system he has that right. His counsel seems to assume that he has an equal right to be enlarged upon bail pending the action of that court.

We are not surprised at such assumption. It has been fostered by the practice and attitude of the prosecuting officials and of the courts. It is time that that attitude and that practice be revised to comply with the actual state of the law—a state which in this instance, at least, is plainly in accord with public interest.

It is an accepted principle of penology that the effectiveness of punishment is in direct ratio to the interval between it and its precedent anti-social act. National Commission on Law Observance and Enforcement, Report on Criminal Procedure, No. 8, June 9, 1931, p. 1. This is based on a psychological reaction. Distance lends enchantment even to prison walls. It is an equally accepted principle of organized society that only the guilty should suffer. There must be an interval, therefore, for the ascertainment of the truth of the accusation or rather for the operation of the machinery fashioned for that purpose. During that interval the two principles work against each other. Any imprisonment may punish an innocent man. Any freedom does prevent the coincidence of the act and its penalty.

Bail or qualified freedom was devised to meet these conflicting interests of society and the individual. Since the focal point of that conflict is the justice of the accusation and the circumstances and attitude of the defendant in each case, bail should logically never be a matter of right. That is the common law, i. e. the view of the judges. 4 Co. Inst. p. 71; 2 Co. Inst. p. 186; 2 Hale, P. C. 129; Egerton v. Morgan, 1 Bulst. 69. The view of the representatives of the people is otherwise. Both in England and in most of the United States the matter has been regulated by constitutions and statutes. Typical provisions are found in the Constitution of New Jersey and in the statutes of the United States:

"All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident or presumption great." Constitution of N. J. art. 1, § 10.

"Bail shall be admitted upon all arrests in criminal cases where the offense is not punishable by death; and in such cases it may be taken by any of the persons authorized by section 591 of this title to arrest and imprison offenders." Section 596, title 18, USCA.

We note that the logic we have contended is preserved in capital cases. In injuries to the state which are comparatively unimportant, it may be expedient to relieve the courts by the enactment of a statutory rule. In the mother country this has been done in a limited class of crimes. Indictable Offences Act, 1848, 11 & 12 Vict. c. 42, § 23, Halsbury's Laws of England, vol. 9, p. 323. We have gone much further, probably because of our historically grounded oppression phobia. There are indications that we are gradually realizing that there is such a thing as the oppression of the mass by the individual.

This explanation has relevancy only in so far as it relates to bail *before* conviction. By a verdict of guilty, twelve good men and true have expressed their solemn opinion that the state has been injured by the prisoner at the bar. The matter is now too serious to absolve the courts by any rule of thumb designed to lighten their labors. The oppression, if any, is now by a "jury of his peers," not by a tyrannical representative of the sovereign. So we find that in almost every ju-

risdiction, bail pending appeal is left, either expressly or impliedly, to the *discretion* of the judges. 6 Corpus Juris, 883; 3 R. C. L. 14. In our circuit, the matter is governed by rule. It is in effect a copy of rule 36 of the United States Supreme Court (139 U. S. Reports, Appendix, page 706) and reads as follows: "1. Where a writ of error has been allowed in a criminal case, the justice or judge who allowed the writ, or any judge of the court which entered the judgment to be reviewed, shall have power to admit the plaintiff in error to bail for his appearance in such court on the determination of the proceedings on the writ of error to abide by and obey any order that may be made therein. * * *" Rule 15, Circuit Court of Appeals, for the Third Circuit, 224 Federal at page x of the Rules. And see also The American Law Institute, Criminal Procedure, § 439, at page 163.

We have indicated the theory that should govern the discretion that is ours. A sound balance between speed of punishment and certainty of guilt, between accusing society and the individual accused depends, we think, first, upon the probabilities of reversal of his conviction, second, upon his personal circumstances, and, third, upon his personal attitude toward society as organized in government.

The machinery for the final ascertainment of the truth in this warfare between society and its anti-social member is the criminal trial. To eliminate too much of the personal equation, general rules for the conduct of such trials have been established. Because of that, their outcome becomes to a certain extent a matter of predictability. But only to a certain extent. These rules require human interpretation and enforcement. We can predict in the field of an exact science. Starch will turn blue on the application of the element iodine. We cannot surely predict the reaction of the judicial mind, appellate or otherwise, to the application of a legal question.

Inexactness in the science of the common law has this limitation. There are principles and precedents to guide and control. It is only the particular judicial reaction to them that is uncertain, complicates the task of prophecy, and makes it a matter of probabilities. In estimating these probabilities, we must make certain assumptions. We must assume that the minds whose reaction we are seeking to forecast are learned in the law, unbiased, and intelligent. That being so, we can eliminate from uncertainty all questions except those on which unbiased, learned, and intelligent students of the law might reasonably differ.

That, then, should be the ratio decidendi of the trial judge in considering the matter of bail after conviction. There are those who advocate a similar basis for the right to appeal itself. That right has not always existed. Cleveland, Summary of Criminal Justice, pt. 7, p. 37. In England to-day leave must be obtained. The field for illustration, being the whole of Anglo-Saxon criminal jurisprudence, is too large to make particular instances instructive. In our own circuit, we have one trilogy it may be worth mentioning. A good many students of criminology think, and some have had the courage to say (Wigmore, vol. 5, § 2511), that the presumption of innocence works a hardship to the public without justification in a logical protection of the individual (maybe another instance of the oppression psychosis we have spoken of). Whether it does or not, it binds the trial courts and its expression is embodied in a standard formula. We have an appeal objecting to the use of the very words prescribed by the United States Supreme Court. We have an appeal complaining of the failure to charge the formula at all. Blatt v. U. S. (C. C. A.) 60 F.(2d) 481. And finally, we have an appeal based on the judge's apparently confusing the forum in which he was sitting and including the word "preponderances" of the civil law in the criminal charge. Thompson v. U. S. (C. C. A.) 283 F. 895. The results of the first two appeals were easily predictable. Learned, unbiased, and intelligent lawyers would not differ as to them—as to the third, they reasonably might.

It is depressing to find that the lawyers practicing in this circuit have been unable to appraise these reasonable differences often. Our Court of Appeals was organized in 1891. The first criminal appeal was not taken until April, 1907, sixteen years later. From 1907 until 1920 there were 10 appeals with 9 affirmances and 1 reversal, or 90 per cent. of affirmances; from 1920 to date there were 54 appeals, with 37 affirmances and 18 reversals, or 66 per cent. of affirmances. From these figures we can, at least, deduce a tendency. Only in the case of Lamar, the notorious "Wolf of Wall Street," was application for denial of bail on appeal made by the district attorney's office. Is In re Lamar (D. C.) 294 F. 688, a sad example of the attitude of the prosecuting officials, or was it due to the spirit of the times?

At any rate, that spirit has changed, as it is apt to under the pressure of events. In 1925, the conference of Senior Judges recommended the following: "But the judicial discretion of the federal courts and judges in granting or withholding bail after conviction should be exercised to discourage review sought, not with hope of new trial, but on frivolous grounds merely for delay." United States v. Motlow (C. C. A.) 10 F.(2d) 657, at page 662. In May, 1934, the United States Supreme Court promulgated (effective September, 1934 [28 USCA § 723a]) a new code for procedure after a plea of guilty. It contains the following provision:

"VI. * * * Bail shall not be allowed pending appeal unless it appears that the appeal involves a substantial question which should be determined by the appellate court." Only this week, Chief Justice Hughes is quoted in the Bar Association Journal (June, 1934) as saying to the American Law Institute: "While there should be a proper opportunity for appeal where substantial questions are presented, there is no reason why review of convictions should not be prompt. The spectacle of persons convicted of crime at large on bail pending unnecessary delays on appeal brings the processes of the courts into public contempt."

It will be noticed that these expressions of policy attempt the use of adjectives in characterizing the kind of appeal question pending the decision of which bail should be allowed. Courts, both the United States and in the states, had previously these same and similar aids to mental digestion. In our view, they do not improve on the reasonable difference rule we have suggested. They themselves require definition, and so we must finally arrive, we think, at our rule. The adjectives most frequently used are "frivolous" and "substantial." The former has been the subject of considerable judicial definition in connection with the law as to sham and frivolous pleas. So we find one authority characterizing such pleas: "So clearly and palpably bad as to require no argument to convince the court thereof, and which would be pronounced by the court indicative of bad faith in the pleader on a mere inspection." 31 Cyc. 610; Oregonian R. Co. v. O. R. (C. C.) 22 F. 245. And see also: "Insufficiency * * * is so glaring that the court can determine it upon a bare inspection, without argument." First Nat. Bank of St. Cloud v. Lang, 94 Minn. 261, 102 N. W. 700, 701. The shift from the use of "frivolous" to "substantial" would seem to be another indication of the still shifting emphasis. It apparently transfers the burden from the government to the defendant. That has always been the law in England. Edgar Gordon, vol. 7, Criminal Appeal Reports, 1911–12, p. 182; Joseph Greenberg, vol. 17, Criminal Appeal Reports, 1922–23, p. 106.

Counsel in his oral argument before us conceded that there was only one substantial, as he argued, ground of appeal. He maintained that the United States failed in its proof and that the case should not therefore have been left to the jury. A careful examination of the 1,076-page record in connection with the assignments of error fully corroborates his concession. It does not corroborate his assertion that the question has substance.

The rule governing the province of the jury is not in controversy. In New Jersey and in our circuit, the jury is, as it should be, given wide latitude. It can determine the guilt or innocence of the defendant in all cases where: "There is substantial evidence of facts which exclude every other hypothesis but that of guilt." Grant v. U. S. (C. C. A.) 49 F.(2d) 118, 119. And see, also, State v. Bricker, 99 N. J. Law, 521, 123 A. 296; State v. Morehous, 97 N. J. Law, 285, 117 A. 296. Let us examine counsel's contention that the jury in the principal case should not have been permitted to function in the light of this pronouncement.

Delaney was the business agent or, in the parlance of the street, "walking delegate," of a labor union of structural steel workers. One Brandle was the president of that union. The prisoner made a practice of receiving money from contractors and associations of contractors as the price of peace in the industry. That such extortion is a betrayal of the interests of the laboring man need hardly be stated. We only mention it because of certain references by counsel to his client as a representative of labor. Delaney did not deny either the receipt of this money or the purpose for which he obtained it. He simply said that he did not keep it but handed it over to his superior and friend, Brandle. He claimed that he was a conduit and collector for, or agent of, the latter. As is customary and is one of the dangers of the possession of illicit money, these bribes were never banked anywhere. They might, therefore, have been kept by Delaney, given to Brandle, or split between them. Brandle was a witness and testified that he never got a penny. The contractors declared that Delaney when he "collected" made no mention of Brandle's participation.

Defendant's counsel says that this evidence is not enough to sustain a conviction. He maintains that there should have been evidence of some use of the money by Delaney. There being no deposit, no bank records are available to supply such proof. In their inevitable absence counsel insists that the government must bring the money home to Delaney by testimony of expenditures by him. In other words, it is argued that a jury can convict only upon the type of testimony preferred by the person on trial. Manifestly that type will always be the testimony that the government has not offered.

■ This is a conception of the law that leaves no room for the difference we have been harping on. It would, in our opinion, be instantly rejected by our or any other Court of Appeals. The accused has no prerogative in the selection of proof of the accusation. He may question the weight of testimony but he cannot object to the kind. The kind in the principal case came from the lips of Brandle and not from those who catered to Delaney's necessities (or luxuries). Brandle may have been lying. If he was, his detection was for the jury whose primary duty it is to estimate the credibility of the witnesses whom they see and hear.

■ Even if we had some doubt as to the probabilities of reversal, we should resolve these doubts in favor of the government because of Delaney's attitude toward that government. His present position seems to be that his quondam associate Brandle has double-crossed him. That attitude is of recent origin. His indictment was contemporaneous with one against the said Brandle for the same offense. Bench warrants were issued upon these indictments. The one for Delaney was never served and the marshal reported that he had disappeared from his home and usual haunts. This disappearance continued until after one jury disagreement as to Brandle's guilt caused the government to accept from him a plea followed by fine and probation. Delaney's counsel admitted that this absence was deliberate and justified it on the ground of his loyalty to his friend. (A loyalty we may say that he now feels is rather one-sided.) Loyalty is in the abstract a beautiful quality. We admire it. When it is found among criminals admiration must yield to our consideration for the general security.

There appears to be no assertion that Delaney's personal circumstances require special treatment and so put in operation that part of our rule. We do not pretend to mini-mize the hardship and humiliation to his family that will be caused by his incarceration. The infliction of that pain upon those whose only offense is their relationship with the guilty is heartrending for all judges. Their duty to the community they serve demands that they steel themselves. In this case we cannot help feeling that the prisoner's counsel is not really serving the interests of that family. Doom, as we see it, surely impends. Neither Delaney nor his loved ones will benefit by postponement of the inevitable. Disappointment will only be added to distress. The English Court of Appeals has given expression to that thought: "There does not appear to be the faintest prospect of success on this appeal, and it is right that I should point out that if the application is persisted in there may be some time wasted. The persons assisting the appellant should be informed that in the opinion of this Court there is no likelihood of success on appeal." Philip Wise, vol. 17 Criminal Appeal Reports, 1922–23, p. 17, at page 18.

Bail is denied.